UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA       :
:
    - v. -       :   12 Cr. 372 (CM)
:
DAVID BLECH,       :
:
         Defendant.       :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S SENTENCING MEMORANDUM


                                  PREET BHARARA
                                  United States Attorney for the
                                  Southern District of New York,
                                  Attorney for the United States of America


MICHAEL A. LEVY
Assistant United States Attorney,
     Of Counsel

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                         :

UNITED STATES OF AMERICA       :

              - v. -                 :         12 Cr. 372 (CM)

DAVID BLECH,                      :

                  Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum in connection with the upcoming sentencing of defendant David Blech. For the reasons that follow, the Government submits that the Court should impose a sentence of imprisonment within the applicable Guidelines range of 41 to 51 months.

## Discussion

In his sentencing submission, the defendant cites a number of personal factors in support of his request that the Court impose a "non-jail sentence." (Def. Mem. at 1). Among other things, the defendant relies on his personal background, his mental health, his family circumstances, and his generosity. But in asking for a non-incarceratory sentence based on these factors, the defendant is not writing on a blank slate. Rather, these are largely the same factors that the defendant relied upon in 1999 (in addition, to be sure, to the fact that he had cooperated with law enforcement) when he successfully persuaded the Honorable Kevin T. Duffy, United States District Judge, to grant him a substantial Guidelines departure and impose a probationary sentence for committing crimes very similar to the ones for which he has again been convicted in this case. The Government respectfully submits that whatever appeal the defendant's arguments

for a probationary sentence may once have had, that appeal was largely exhausted in the course of obtaining his earlier probationary sentence. To award such leniency to this recidivist defendant again, based on the same personal factors, would be, in effect, to confer on him a perpetual get-out-of-jail-free card for securities fraud.

I.       The Defendant's Prior Offenses and Sentence

The conduct for which the defendant was previously convicted is described in the 5K letter ("5K Ltr.") that was submitted by the Government in connection with his 1999 sentencing.[1] As described in that letter, the defendant pled guilty to carrying out two separate securities fraud schemes. In the first scheme, carried out in the summer of 1994, the defendant caused his company – D. Blech & Co. – to engage in a variety of fraudulent practices in order to trick the company's clearing broker into believing that D. Blech & Co. was selling off its securities holdings and reducing its margin credit; *i.e.*, in order to make the clearing broker believe that D. Blech & Co. was reducing its borrowing and putting itself in a more stable financial condition by selling off securities that D. Blech & Co. had bought with borrowed money. (5K Ltr. at 2-4). Of particular note for purposes of the instant case, one of the fraudulent mechanisms that the defendant employed was to "open[] numerous securities accounts at various broker-dealers in the names of nominees" and then – for purposes of deception – engage in trading between accounts that were actually in the defendant's name, on the one hand, and these nominee accounts that were under his control, on the other hand. (5K Ltr. at 3). This is practically the same criminal scheme that the defendant has been convicted of perpetrating again in the instant case.

---

[1] Because they relate to a cooperator sentencing, all of the documents cited herein with respect to the 1999 sentencing will be submitted directly to the Court under separate cover.

The above-described scheme – carried out in 1994 – was only one of two schemes for which the defendant was previously convicted. As described in the 5K Letter, "In early 1998, shortly before Blech was to enter a guilty plea in connection with the scheme to defraud [the clearing broker], this Office learned that Blech had undertaken a second criminal scheme *even as he was cooperating with the Government*." (5K Ltr. at 2) (emphasis added). This scheme – again, just like the current offense – involved the defendant taking control of approximately 67 nominee accounts "in the names of various friends, family members and business associates" and engaging in market manipulation by trading back and forth between accounts under his control and, thereby, fraudulently driving up the price of the securities traded. (5K Ltr. at 4-5).

In connection with sentencing in 1999, defense counsel submitted a 20-page letter that – as defense counsel has done in this case – "urge[d] [the Court] to impose a sentence of probation." (1999 Sent. Ltr. at 3). Defense counsel sought a departure from the applicable Guidelines range – calculated by the U.S. Probation Office in the Presentence Investigation Report as 78 to 97 months – in part because of the defendant's cooperation with law enforcement. (1999 Sent. Ltr. at 10-13). But defense counsel also expressly sought downward departures based on a variety of the same personal factors that defense counsel in the instant case once again seeks to rely upon. For example, in 1999, as here, defense counsel argued that: (i) "David Blech's history of mental illness provides a compelling basis for a downward departure" (1999 Sent. Ltr. at 13-16); (ii) "the fragile condition of Mr. Blech's children and parents and the emotional and financial dependence of his family [] constitute another basis for a downward departure" (*id*. at 17-18); and (iii) "Mr. Blech's acts of generosity and his contributions to

-3-

beneficial science and medicine over a period of many years constitutes a convincing basis for a downward departure" (*id*. at 18-19).

At the sentencing proceeding before Judge Duffy, defense counsel reiterated many of these same points. (Tr., 9/30/99, at 3-19). For his own part, the defendant told Judge Duffy, "I solemnly pledge that nothing like this would have happen [sic] again." (*Id*. at 20).

Judge Duffy granted the defendant's request for a downward departure and did, indeed, impose the requested sentence of probation. (*Id*. at 21). But in the very next sentence after informing the defendant that he was "not going to send [him] to jail," Judge Duffy added:

> But you made a statement which you suggested that you were pledging it would never happen again. You can pledge that to your family, but I don't take any chances. I'm putting you on probation for a period of five years. I want you to know that if you violate the probation, you will go to jail. . . . I want you to understand you are walking around with the key to the jail, a one-way key in your pocket. If you screw up, you had best believe you will go to jail.

(*Id.* at 21-22).

Judge Duffy later added, "You have been dealt with, I think, justly, but with a great deal of charity. God forbid you should ever come back to this courtroom. The charity will disappear and the justice alone will be made." (*Id*. at 24).

II.     The Instant Offense Conduct and Sentencing Submission

In May 2007, less than three years after completing his term of probation for offenses he had pledged to Judge Duffy he would never commit again, the defendant committed practically the same offense again – twice. As described in the presentence investigation report prepared by the United States Probation Office in the instant case (the "Presentence Report" or "PSR"), the

defendant engaged in two separate fraudulent schemes to prop up the stock price of two separate companies while the defendant unloaded a substantial portion of his holdings.

Specifically, with respect to Count One, between May and September 2007, the defendant sold approximately 50 million shares of Pluristem Therapeutics, Inc. ("Pluristem"). Instead of simply selling the shares, however, which would have destroyed the value of the thinly traded stock, the defendant used several dozen nominee accounts held in the names of others to buy approximately 100 million shares and sell approximately 150 million shares. This had the net effect of permitting the defendant to sell the desired 50 million shares, while fraudulently and manipulatively propping up the price of Pluristem in the process by making it appear to investors that the market for Pluristem was liquid and had significant buying interest. By concealing his selling activity through the use of dozens of nominee accounts, the defendant was able to raise approximately $1.2 million for his shares when, had he simply put his 50 million shares up for sale openly, he might not have found sufficient buyers for the thinly traded stock at any price. (PSR ¶¶ 10-14, 18).

Similarly, with respect to Count Two, between February 2008 and March 2008, the defendant sold approximately 400,000 shares of Intellect Neurosciences, Inc. ("Intellect"). Once again, however, the defendant concealed this selling activity through the fraudulent use of dozens of nominee accounts. As he had done with Pluristem, the defendant used his nominee accounts to buy approximately 1.6 million shares while selling approximately 2 million shares. This had the net effect of fraudulently and manipulatively propping up the price of Intellect, by making it appear that there was liquidity and buying interest when, in fact, the defendant's trades represented nothing but the sale of 400,000 shares. By concealing his selling activity through the

use of dozens of nominee accounts, the defendant was able to raise approximately $138,000 for his Intellect shares when, had he simply put his 400,000 shares up for sale openly, he might not have found sufficient buyers for the thinly traded stock at any price.  (PSR ¶¶ 15-18).

In the Presentence Report, the Probation Office has determined that the applicable Sentencing Guidelines range calls for a term of imprisonment of between 41 and 51 months.  (PSR ¶ 80).  As he did in 1999 – when he was convicted of engaging in two similar securities fraud schemes – the defendant requests that the Court nonetheless impose "a non-jail sentence." (Def. Mem. at 1).  The defendant premises this request on many of the same factors that he relied on to avoid prison in 1999.  For example, having moved for a downward departure based on his psychiatric condition in 1999, the defendant now asserts that a sentence of probation is warranted once again because of "the ways in which [the defendant's] psychiatric problems contributed to his behavior," (Def. Mem. at 15), and in order to ensure that his current psychiatric "treatment is not interrupted" (Def. Mem. at 18).  Similarly, having moved for a downward departure in 1999 based on the exceptional fragility of his family, the defendant now asserts that a sentence of probation is warranted once again because his family circumstances were among the "stressors that operated on [him] during the run-up to the events to which he has pleaded guilty" (Def. Mem. at 18), and because, having then committed the crimes partly as a result of those stressors, the ongoing "needs of his children" combine with other factors to make a non-prison sentence appropriate (Def. Mem. at 31; *see also* Def. Mem. at 54 (asserting that, in light of the defendant's "extraordinary family circumstances," the Court "should sentence [the defendant] to a non-jail sentence")).  Finally, having sought a non-prison sentence in 1999 based in part on his supposed

generosity and good works, the defendant again argues for a sentence of probation by describing various supposed instances his "generosity and kindness to others." (Def. Mem. at 31-35).

III.    Argument

    A.    The Personal Factors Cited by the Defendant Do Not Justify the Leniency that the Defendant Requests

The personal factors cited by the defendant do not counsel in favor of the sentence of probation that the defendant seeks.  In the first place, as noted above, the defendant has relied on these factors before.  He cited his mental health, his family circumstances, and his supposed generosity and good character in 1999, in the course of obtaining a sentence of probation from Judge Duffy.  Judge Duffy made clear then that while a sentence of probation was "just[]" in light of the defendant's circumstances, such a lenient sentence also required a "great deal of charity" from the court.  (Tr., 9/30/99, at 24).  By abusing this opportunity and committing virtually the same securities offenses two more times, the defendant has forfeited any claim to such charity again.  Whereas his personal circumstances might appropriately have been the central, dominant factor in the court's analysis last time, the dominant factor that cannot be ignored this time is that this defendant is a recidivist securities fraudster who – having been directly warned about what would happen to him if he returned to court for such offenses again – knowingly went out and engaged in two additional fraud schemes.  Against the weight of the record that this defendant has built for himself, the Government submits that the defendant's personal factors no longer meaningfully move the scales.

In addition, even on the merits, the personal factors that the defendant cites are far less compelling than he claims.  With respect to his psychiatric condition, the defendant pointedly accepts responsibility for his actions (and the Government agrees that he has manifested genuine

-7-

acceptance of responsibility), but asserts at the same time that his "many psychiatric and psychological problems have contributed significantly to his criminal conduct, which was caused, in part, by his impulsive response style and risk-taking behavior." (Def. Mem. at 16) (internal quotation marks omitted).  But the conduct at issue here was far from impulsive in nature.  Rather, the defendant took the time either to open or assume control over dozens of nominee accounts and then used those accounts to engage in a manipulative selloff of his Pluristem stock over a span of *four months*, and then, later, to engage in a manipulative selloff of his Intellect stock over the span of another month.  The defendant's psychiatric issues may shed some light on the impetus for his criminal actions, but they do not do as much as the defendant suggests to explain (and they do nothing to excuse) such a long-running pair of schemes as the ones he has pled guilty to carrying out.  This is particularly true in light of the fact that the defendant had already claimed in 1999 to have identified and taken steps to control this supposed cause of his criminal conduct.

As for the defendant's family circumstances, there is no denying that the defendant's children – both natural and adopted – have had tremendous difficulties and have often, as a result, been more reliant on the defendant than many children would be on their parents.  This was, as already noted, an issue that was prominently addressed by the defendant in 1999.  But, 13 years later, it appears that all but one of these children has reached the age of majority and moved out of the defendant's home.  Even the defendant's youngest and only minor child is already 15 years old.  Thus, the defendant's family circumstances are far less extraordinary than they were in 1999.  Moreover, at this sentencing for what are now the defendant's third and fourth criminal securities fraud schemes (counts one and two of the earlier case and counts one

-8-

and two here), reliance on his family circumstances in seeking to be spared a term of imprisonment starts to look less like a genuine request for leniency and more like an attempt to use familial difficulties as a shield to avoid punishment for repeated criminal conduct.

      B.      <u>The Defendant Should Be Sentenced Within the Applicable Guidelines Range of 41 to 51 Months</u>

The defendant contends that the applicable Guidelines range in this case is not – as the Probation Office has found – 41 to 51 months, because, he claims, his gain was not between $1 million and $2.5 million, but, rather, was zero. As explained below, the defendant is wrong – the applicable Guidelines range is, indeed, 41 to 51 months. Moreover, as is also explained below, the defendant deserves a sentence of that length, even if the Court uses its discretion to determine that this is an instance in which the issue of loss and gain under the Guidelines is sufficiently complicated and peripheral to resolve.

      1.      <u>Gain</u>

The defendant's gain *during the period of illegal market manipulation* with respect to which he has pled guilty – meaning, between May 15 and September 17, 2007 for Pluristem and February 15 and March 13, 2008 for Intellect – was approximately $1.3 million. (PSR ¶¶ 14, 16, 18). That is to say, the defendant bought and sold shares during those periods for the purpose, when the transactions were netted out, of selling off a large portion of his holdings, and, by doing so through this manipulative method, converted approximately 50 million shares of Pluristem and 400,000 shares of Intellect into approximately $1.3 million in cash.

This calculation appropriately deducts the defendant's cost of engaging in the scheme *during the period of the scheme*. For example, the defendant sold approximately 150 million shares of Pluristem during the period of the scheme charged in Count One. The gain amount,

-9-

however, does not simply reflect the revenue from the sale of those 150 million shares. Rather, the calculation appropriately recognizes that in order to manipulatively pump up the volume of Pluristem trading in order to make those sales, the defendant had to buy 100 million shares of Pluristem. The cost of buying those shares has been deducted, leaving the gain to represent only what the defendant received from the *net* sale of 50 million shares.

The defendant argues that he should receive credit not only for his expenses in carrying out the scheme during the charged period, but also for the earlier cost of buying the 50 million shares in the first place. (Def. Mem. at 47) ("The problem with the government's analysis is that it fails to take into account Mr. Blech's cost to purchase the shares that it alleges Mr. Blech sold for a gain.") But this is not an exercise in calculating the defendant's tax liability for his years of investment in Pluristem and Intellect. Rather, the purpose of the gain analysis is to determine what the defendant obtained during the period of the fraud that he would not have obtained absent having engaged in the fraud.

Here, the defendant was the largest shareholder in these two companies by such a significant margin that, even after dumping the shares at issue through fraud, "Mr. Blech remained the largest shareholder in Pluristem and Intellect." (Def. Mem. at 46). If he had simply and honestly placed on the market the large number of shares he intended to sell, it is a fair inference that the market for Pluristem and Intellect shares would simply have collapsed and the defendant would not have received anything for those shares. In fact, it is precisely this fear that motivated the defendant to engage in fraud. As he explained during his guilty plea allocution, he engaged in the Pluristem scheme precisely because he feared that selling his Pluristem shares openly might "destroy the value of my Pluristem position or the equity value of

the company." (Tr., 5/9/12, at 15). Thus, a reasonable estimate of the defendant's gain is the $1.3 million he was able to get for his shares, since absent the fraud he would likely have gotten nothing.

The defendant's assertion that his gain should be reduced by the cost basis of his shares – *i.e.*, the cost he incurred to acquire them before the period of the charged scheme – is illogical. Take, for example, two hypothetical defendants who engage in identical market manipulation schemes that permit them to sell 50 million shares of a stock at 2 cents per share. Under the defendant's theory, if one of those defendants had obtained his shares two years prior to the scheme as a gift, his cost basis would be zero and his gain for Guidelines purposes would be $1 million. On the other hand, if the other defendant had obtained his shares two years before the fraud by paying 4 cents per share for them, his cost basis would be $2 million and – under the defendant's theory – his gain for Guidelines purposes would be zero because he lost money on his overall investment.

A distinction between two such defendants based on how much they originally paid for their shares makes little sense. The Guidelines are not concerned with how much the defendant did or did not gain across the several years in which he was invested in Pluristem or Intellect. Rather, the Guidelines are concerned with identifying the "gain that *resulted from the offense*." U.S.S.G. § 2B1.1 comment. (n.3(B)) (emphasis added). Here, the offenses are the defendant's manipulations during the course of what the Information defines as the "Pluristem Selloff" and the "Intellect Selloff" (Inf. at ¶¶ 5, 13), and his gain is the revenue he obtained during the periods of those selloffs that he would not have obtained absent the offenses. For the reasons set forth above, a reasonable estimate of that gain is between $1 million and $2.5 million. It is

certainly not "zero," as the defendant argues, since even if the defendant lost money over the course of his years of investment in Pluristem and Intellect, his machinations to prop up the price of Pluristem and Intellect during the periods of the selloffs – *i.e.*, the periods of the offenses of conviction – certainly gained him more favorable sales prices for his stock than he would have obtained absent the fraud. (Def. Mem. at 44).

In any event, if the Court does not adopt the Probation Office's recommendation that the defendant's gain was between $1 million and $2.5 million, the Government respectfully submits that this may be the type of case contemplated by the Second Circuit Court of Appeals in which precise calculation of the applicable Guidelines range is unnecessary:

> In *United States v. Crosby,* 397 F.3d 103, 112 (2d Cir.2005), we stated that "precise calculation of the applicable Guidelines range may not be necessary [in making a sentencing determination] .... [S]ituations may arise where either of two Guidelines ranges, whether or not adjacent, is applicable, but the sentencing judge, having complied with section 3553(a), makes a decision to impose a non-Guidelines sentence, regardless of which of the two ranges applies." "This leeway," we wrote, "should be useful to sentencing judges in some cases to avoid the need to resolve all of the factual issues necessary to make precise determinations of some complicated matters, for example, *determination of monetary loss.*" *Id; see also United States v. Cavera,* 550 F.3d 180, 190 (2d Cir.2008) (en banc) (stating that omission of the Guidelines calculation may sometimes be justified, citing *Crosby); see also Cavera,* 550 F.3d at 200 n. 4 (Raggi, *J.,* concurring) (explicitly reaffirming *Crosby*'s approach in this regard).

*United States v. Dhafir*, 577 F.3d 411, 415 (2d Cir. 2009) (emphasis added).

Here, the Government submits, the importance of the defendant's gain to the sentence that should be imposed is unusually limited. With respect to the defendant's actual conduct, there is no dispute. The parties appear to have no disagreement either as to what the defendant did in the course of his criminal conduct, or what he was trying to accomplish by that conduct.

-12-

Determining precisely how successful the defendant's conduct was in achieving his illegal objectives might ordinarily be of some value, but, the Government submits, is not of enough value on these facts to be worth a full-blown evidentiary hearing involving a battle of experts. This is particularly true in light of the parties' shared emphasis on various personal factors in their sentencing submissions. Although the parties disagree on which non-Guidelines factors deserve more weight – the Government focuses on the defendant's recidivism, while the defendant focuses on his psychiatric condition, his family circumstances, and his character – both sides have placed great weight on non-Guidelines factors.

Accordingly, although the Government submits that the Guidelines have been properly calculated by the Probation Office, the Government respectfully submits, for the reasons that follow, that the appropriate sentence for the Court to impose is one between 41 to 51 months' imprisonment, whether the Court bases that decision on the properly calculated Guidelines range or declines to resolve the issue of gain and imposes it as a non-Guidelines sentence.

2.    The Appropriate Sentence is Between 41 and 51 Months' Imprisonment

Whether as a Guidelines sentence or a non-Guidelines sentence, the defendant should be sentenced to a significant term of incarceration – specifically, a term of between 41 and 51 months' imprisonment. This is the defendant's second conviction for securities fraud, encompassing four separate schemes. The defendant engaged in securities fraud in 1994. After having been caught, the defendant nonetheless engaged in further securities fraud in 1998, even as he was cooperating with the Government. At sentencing, the defendant asked for leniency, citing his cooperation, his psychiatric problems, and his family circumstances. He also promised the district court that he would never commit such offenses again. The district court responded

-13-

by giving him probation.  Less than three years after finishing probation, however, the defendant again committed securities fraud in connection with his sale of Pluristem stock.  Months later, he committed securities fraud again in connection with his sale of Intellect stock.

   The defendant's claim to the leniency of a non-jail sentence rings hollow in light of his history.  He committed securities fraud in 1994. Thereafter, the opportunity he was afforded to cooperate with the Government did not prevent him from committing securities fraud again in 1998.  Thereafter, the leniency shown him by Judge Duffy did not prevent him from committing securities fraud again in 2007 and 2008.  As Judge Duffy told the defendant in no uncertain terms at his last sentencing, "You have been dealt with, I think, justly, but with a great deal of charity.  God forbid you should ever come back to this courtroom.  The charity will disappear and the justice alone will be made."  (Tr., 9/30/99, at 24).  That the defendant now finds himself not before Judge Duffy, but in a different courtroom in the same courthouse, does not change the result that is required – that the defendant finally receive a significant sentence of imprisonment.

Dated: New York, New York  
   March 4, 2013

               Respectfully submitted,

               PREET BHARARA  
               United States Attorney

          By: /s/ Michael A. Levy  
             MICHAEL A. LEVY  
             Assistant United States Attorney  
             (212) 637-2346